United States District Court
Southern District of Texas
**ENTERED**
April 20, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:15-CR-1139 |
| | § | |
| ALFREDO ESCOBEDO JR, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER ON MOTION TO SUPPRESS

Defendants Alfredo Escobedo, Jr. and Eusebio Salazar, Jr. are charged with three counts of transporting, and conspiracy to transport, aliens in the United States in violation of the law. Indictment, D.E. 16. Pending before the Court are their respective motions to suppress (D.E. 28, 30), claiming that all of the evidence against them was obtained in violation of the Fourth Amendment prohibition of unreasonable searches and seizures. For the reasons set out below, the Court DENIES the motions.

## FACTS

Border Patrol Agents Jeffery Bennett,[1] Jason Dipple,[2] and Kenneth Howard[3] testified at the suppression hearing on April 15, 2016. According to their testimony, at approximately 7:18 in the morning of December 11, 2015, the United States Border

---

[1] Agent Bennett has worked for the United States Border Patrol for nearly 14 years, primarily in the Kingsville, Texas station. He has been assigned to terrorism, immigration, and narcotics details in Kenedy and Kleberg Counties, Texas.

[2] Agent Dipple has worked for the Border Patrol for nearly 9 years, assigned to the Kingsville station and working primarily on alien smuggling.

[3] Agent Howard also worked for the Border Patrol at the Kingsville station and had done so for over 7 years. He is currently in their prosecution unit.

1

Patrol received an anonymous tip by telephone. The caller stated that a black Mercedes bearing Texas license plates GLS-2624 was seen picking up three persons along the roadside of Highway 77, north of the Sarita checkpoint. This tip was communicated by radio to the agents in the field so that they could be alert to that vehicle. The Border Patrol receives such tips nearly every shift. This particular tip was considered credible because the activity reported was consistent with well-known operating procedures of those who transport illegal aliens.

**Established Route**. Highway 77 is an established route for alien transportation because it is one of only two routes in the Texas region extending from the Mexican border through Brownsville and McAllen into the interior of the United States. It is direct. And while the activity involved in this case was more than 50 miles from the border, alien transportation efforts are concentrated there because the highway connects primarily to ranch land and does not connect to other thoroughfares until well north of the Sarita checkpoint, in the Riviera area. In the words of Agent Bennett, "all roads lead to nowhere" prior to Riviera. Once traveling Highway 77, there is no option for vehicles but to continue on that highway through the Sarita checkpoint to Riviera. The Border Patrol intercepts aliens being transported on this route daily.

**Established Pick-Up Location**. The location was consistent with the known tendency of transporters to drop off aliens prior to the Sarita checkpoint as they drive north so that the aliens can walk in the surrounding fields and avoid the checkpoint. They are then picked up north of the checkpoint near the highway rest area. The rest area is well lit and near a tower that provides an easy-to-identify landmark for a meeting

place.  It also provides cover for the transporters as they can sit in—or leave—their cars at the rest stop and wait without attracting too much attention.  They can proceed south from the rest area and use convenient crossovers to turn and head north without going in the vicinity of the checkpoint or its license plate-reading cameras.  The tip placed the pickup in this area, identified by dispatch as "K-18."

**No Other Purpose for Pickup**.  It was consistent with alien transportation to presume that the three individuals picked up on the side of the road were aliens unlawfully in the country.  There are no businesses or other legitimate reasons for persons to be out and about the roadside in that area of inhospitable brush country.

**Established Timing**.  The timing was consistent with the tendency of transporters to act during established Border Patrol shift changes in order to capitalize on outgoing agents' fatigue and the preoccupation of incoming agents with the logistics of partner and unit assignments.  The morning Border Patrol shift change has been at 6:00 a.m. for long enough that perpetrators can and do count on its distractions to aid their successful violation of the law.  The Agents' experience was that incidents of alien transportation increased around the time of shift changes.  It is also common for illegal activity to start consistent with school and business hours during the daytime so that it is easier for the vehicles to blend in with ordinary traffic.

**Observations of Defendants' Vehicle**.  Agents Bennett and Dipple were uniformed, in a marked Border Patrol unit, south of Riviera and heading further south on Highway 77, but north of the identified pick-up spot.  In response to the tip, they turned onto a highway crossover facing the north-bound traffic and waited.  In the meantime,

there were numerous unmarked under-cover units on the lookout for the vehicle and they had noticed a black BMW rather than a Mercedes. While Agents Bennett and Dipple were waiting, other agents had confirmed that the BMW was bearing the license plate numbers reported in the tip. Within ten to fifteen minutes, Agents Bennett and Dipple spotted the black BMW. They pulled out behind the BMW and, if there were to be a stop of the BMW, they would handle it from their marked unit. Other agents, however, were also in covert pursuit.

Ordinarily, drivers, upon noticing a Border Patrol unit pull up behind them, will tap their brakes and slow down. The BMW sped up. While agents can ordinarily catch up to a car to get a look inside within about a mile of beginning the effort, Agent Dipple was driving his unit in excess of 100 mph in that 75 mph zone and it still took about four miles to catch up.[4] They were able to confirm that the BMW's license plate was the same as that reported as being on the Mercedes and could understand the caller's confusion of the two luxury vehicles. They were unable to see inside the vehicle because its windows had extra-dark tint, consistent with that used by alien transporters.

They decided to make the stop and waited until they had crossed the bridge at Los Olmos Creek. Despite the Agents activating their lights and siren, the BMW did not slow down. Instead, the driver tried to turn off onto a crossroad, but was traveling too fast and missed the road. The BMW returned to the highway's shoulder and then started to pull over again near a Texas Department of Public Safety weigh station, but aborted that

---

[4] While the report does not mention anything about the speed of the BMW or the chase, Agent Bennett explained that he had written the report and that, as passenger rather than driver, he did not take note of the speed they had been driving. Agent Dipple, as driver, was able to testify that he had to drive in excess of 100 mph trying to catch up to the BMW.

effort.  On the third try, the BMW pulled over just short of the school zone near an open field and stopped, whereupon three back seat passengers exited the BMW and ran.  Other Border Patrol agents in unmarked cars who had been following these events chased them down and apprehended them.

In the meantime, the BMW rammed Agent Dipple's unit and tried to get away.  However, the Agents were able to drive ahead of it and stop it.  The Agents then apprehended Defendants—the driver and front seat passenger.  Agent Bennett testified that everything about Defendants' actions made it "pretty obvious" that they were transporting aliens.

**Evidence for Suppression**.  On cross-examination, the Agents admitted that they had no corroboration of the telephone tip other than its specificity, timeliness, and general consistency with the methods of transporting aliens near the Sarita checkpoint.  They did not know the identity or characteristics of the tipster.  There is no evidence of the tipster's reputation for truthfulness and he or she obviously mis-identified the make of the car.  Furthermore, the tip did not involve details regarding the timing of the pickup, a description of the driver, or the appearance of the three individuals who had been picked up to indicate that they had just walked through significant amounts of Texas brushland.

The Agents admitted that the activity was contrary to standard alien transportation procedures in that a luxury vehicle, rather than a van or pickup truck, was used.  When they encountered the BMW, Agent Bennett did not notice any excessive weight and could not see inside to verify passengers, although Agent Dipple testified that he could

5

tell that there was some weight in the back passenger area.[5]  They testified that they did not observe any violation of the law in the way that the BMW was operated prior to their decision to stop it.  However, Agent Dipple noted that, in his experience, when a car is operated in the way the BMW was operated upon having Border Patrol pull up behind them, the unlawful transportation of aliens is always involved.

## DISCUSSION

Defendants contend that the Border Patrol Agents did not have probable cause or a reasonable suspicion to make the stop as required by the Fourth Amendment.  They base their argument on the assumption that an investigatory stop constituting a seizure was initiated by the Agents' use of overhead lights and sirens to signal the BMW to stop. While that might be the case had the Defendants complied, a driver's refusal to stop in response to a show of authority extends the period of time in which reasonable suspicion or probable cause may accumulate.

The Fifth Circuit found a seizure to be lawful based on evidence that occurred after the Border Patrol activated lights and sirens, writing:

> A seizure occurs either when a suspect is physically forced to stop or when the suspect submits to the officer's show of authority.  But a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject.  Only when an encounter is classified as seizure must the reviewing court determine whether there was reasonable suspicion.

---

[5] While this observation did not appear in the report, Agent Dipple explained that the report was written by Agent Bennett and that he did not contribute to it or review it.

> Alvarez contends that we should find that the Border Patrol agents lacked reasonable suspicion to believe that he had committed an offense, based in part upon his assertion of fact that the agents turned on their emergency lights, and the Suburban yielded to the agents['] show of authority. Ramirez makes the same assertion. If the agents actually had stopped the Suburban, we would need to make a reasonable-suspicion determination.
>
> The district court found, however, that the appellants' version of the facts is not what happened. Soon after the agents' show of authority, the Defendants' vehicle admittedly came to a stop, but this was hardly because the Defendants were submitted to authority. The court found that on the contrary, the passenger door opened and both defendants promptly exited the vehicle . . . and fled the scene, running in a circuitous route over the course of four city blocks.

*United States v. Alvarez-Arriaga*, 43 F.3d 668 (5th Cir. 1994) (per curiam; not selected for publication) (citations omitted; internal quotation marks and brackets omitted) (citing *United States v. Santamaria-Hernandez*, 968 F.2d 980, 982 (9th Cir. 1992)).

This is consistent with Supreme Court authority:

> In sum, assuming that Pertoso's pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.

*California v. Hodari D.*, 499 U.S. 621, 629 (1991).

Here, Defendants were not seized until after the BMW engaged in erratic and evasive driving maneuvers, after their unlawful alien passengers were witnessed running from their vehicle, and after the BMW, driven by Defendant Salazar, rammed the Border

Patrol unit. Under these circumstances, the Border Patrol Agents had abundant reasonable suspicion and probable cause to stop and arrest Defendants.

For these reasons, the Court DENIES the motions to suppress (D.E. 28, 30).

ORDERED this 20th day of April, 2016.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE